**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROSS WEINTRAUB, Derivatively on Behalf of Nominal Defendant TESLA, INC., | X : | |
| Plaintiff, | : : | Case No._____ |
| v. | : : | **VERIFIED SHAREHOLDER** |
| ELON MUSK, BRAD W. BUSS, ROBYN M. DENHOLM, IRA EHRENPREIS, ANTONIO J. GRACIAS, STEVE JURVETSON, JAMES MURDOCH KIMBAL MUSK, and LINDA JOHNSON RICE, | : : : : | **DERIVATIVE COMPLAINT** <u>JURY TRIAL DEMANDED</u> |
| Defendants, | : : | |
| -and- | : : | |
| TESLA, INC., a Delaware corporation, | : : | |
| Nominal Defendant. | : X | |

Plaintiff Ross Weintraub ("Plaintiff"), by his attorneys, alleges for his Verified Shareholder Derivative Complaint against defendants upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, as follows:

<u>**SUMMARY OF THE ACTION**</u>

1.     This a shareholder's derivative action brought on behalf of nominal defendant Tesla, Inc. ("Tesla" or the "Company"), by one of its shareholders against certain of the Company's officers and members of its Board of Directors (the "Board"), alleging that these officers and directors (collectively, the "Individual Defendants" as defined herein) breached their fiduciary duties by failing to ensure that the Company had internal controls and oversight mechanisms to monitor Elon Musk's ("E. Musk") Twitter use and by willfully and/or recklessly causing or allowing the Company to issue false and misleading statements or failing to disclose material adverse facts about Tesla's business, operations and future prospects.

2.      Following the financial crisis, Tesla co-founder, E. Musk, gained operational control over Tesla, adding the role of Chief Executive Officer ("CEO") in October 2008 to his titles of Chairman and Product Architect.  In this capacity, E. Musk oversaw daily operations, including production of Tesla's first vehicle, the Roadster, which it launched in 2008.

3.      As of December 31, 2017, E. Musk owned 37,853,041 shares or 21.9% of Tesla's common stock, making him Tesla's largest shareholder both among institutions and individuals. E. Musk is widely recognized as the leader and brains behind Tesla's electric car and solar panel operations.  The Company itself has acknowledged that it is "highly dependent on the services of E. Musk" – and that such reliance constitutes one of Tesla's business risks.  *See* Form 10-Q, filed August 6, 2018.

4.      E. Musk created a profile on the social media application Twitter (twitter.com/elonmusk) in 2009, which he uses to communicate with millions of people about Tesla's business.  E. Musk, who has gained near celebrity status in recent years, possessed more than 22 million Twitter followers by August 2018.

5.      Tesla's Chief Financial Officer ("CFO")reportedly described E. Musk's Twitter statements as a "strong channel of marketing" with E. Musk acting as a "spokesman" for Tesla. On November 5, 3013, Tesla filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") stating that it intended to use E. Musk's Twitter account as a means of announcing material information to the public about Tesla and its products and services and has encouraged investors to review the information about Tesla published by E. Musk via his Twitter account:

**Tesla Disclosure Channels To Disseminate Information**

Tesla investors and others should note that ***we announce material information to the public about our company, products and services and other issues through a variety of means, including Tesla's website, press releases, SEC filings, blogs and social media***, in order to achieve broad, non-exclusionary distribution of information to the public. We encourage our investors and others to review the information we make public in the locations below as such information could be deemed to be material information. Please note that this list may be updated from time to time.

**Interested in keeping up with Tesla?**

For more information on Tesla and its products, please visit: teslamotors.com

For more information for Tesla investors, please visit: ir.teslamotors.com

For the latest information from Tesla, including press releases and the Tesla blog, please visit: teslamotors.com/press

***For additional information, please follow Elon Musk's and Tesla's Twitter accounts: twitter.com/elonmusk and twitter.com/TeslaMotors***[1]

6.     Although the Individual Defendants were responsible for ensuring the Company had disclosure controls to ensure the adequacy of Tesla's statements, and specifically attested to the effectiveness of such controls and procedures in each of its annual reports on Form 10-K,  the Individual defendants did not have any corporate policies that specifically addressed E. Musk's use of Twitter.  Indeed, Since November 5, 2013, when Tesla filed its Form 8-K disclosing that E. Musk's Twitter account would be used to disseminate material information about the Company, Tesla did not have disclosure controls or procedures in place to assess whether the information published by E. Musk via his Twitter account was required to be disclosed in Tesla's Exchange Act reports within the time periods specified in the SEC's rules and forms.  Nor did Tesla have sufficient processes in place to ensure the information E. Musk published via his Twitter account was accurate or complete.  E. Musk did not routinely consult with anyone at

---

[1] At all times, emphasis is added unless otherwise indicated.

Tesla before publishing Tesla-related information via his Twitter account and no one at Tesla reviewed E. Musk's tweets prior to publication.

7.     Instead, from this point forward, the Individual Defendants completely abdicated their fiduciary duties, misleading investors into believing that Tesla maintained adequate disclosure controls and procedures and allowing E. Musk – whose conduct has become increasingly erratic – to embark on a campaign of false and misleading statements designed to fuel his long-standing feud with short-sellers.

8.     The Individual Defendants' misdeeds culminated on August 7, 2018 with a series of false and misleading tweets by E. Musk designed to convince the market that funding was "secured" for a going private transaction and all that was needed to "pull it off" was a shareholder vote.

9.     Specifically, at approximately 12:48 p.m. EST on August 7, 2018, during trading hours, E. Musk tweeted to his over 22 million Twitter followers, "Am considering taking Tesla private at $420.  Funding secured."  Over the next three hours, E. Musk elaborated on this statement with additional tweets:

- "My hope is *all* current investors remain with Tesla even if we're private.  Would create a special purpose fund enabling anyone to stay with Tesla."

- "Shareholders could either to [sic] sell at 420 or hold shares & go private."

- "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote."

10.     The truth regarding the Individual Defendants' misdeeds began to emerge on August 8, 2018, when it was revealed that Tesla's Board was still evaluating the prospects of a going private transaction and the SEC was inquiring into whether E. Musk had a factual basis

claiming that he had "secured" funding for the proposed transaction and all that was needed was a shareholder vote to confirm the deal.

11.    Over the following days and weeks, Tesla was forced to scramble to contain the damage and disruption caused by E. Musk's tweets and emerging revelations that the going-private transaction E. Musk claimed was funded and simply subject to a stockholder approval, was merely in its infancy.

12.    On September 27, 2018 and September 29, 2018, respectively, the SEC filed lawsuits against E. Musk and Tesla alleging violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder against E. Musk and violations of Rule 13a-15 of the Exchange Act against Tesla.[2]

13.    Among other things, the SEC's complaints reveal numerous details regarding the falsity of E. Musk's statements regarding a going private transaction and the Board's abdication of its fiduciary duties – including the fact that "Tesla did not have any controls or procedures regarding [E.] Musk's use of Twitter to Disseminate Information About Tesla."

14.    The Individual Defendants' wrongful conduct has significantly and materially harmed the Company.  By virtue of the Individual Defendants' breaches of fiduciary duties, the Company is not only subject to a lawsuit by the SEC for which it may pay more than $20 million in monetary penalties, but Tesla also faces numerous class action lawsuits alleging violations of the federal securities laws, and Tesla has suffered significant disruption of, and damage to, its business, its reputation and goodwill.

---

[2] The lawsuits are captioned *United States Securities and Exchange Commission v. Elon Musk*, Civ. No. 1:18-cv-8865 (S.D.N.Y.), filed September 27, 2018 and *United States Securities and Exchange Commission v. Tesla, Inc.*, Civ. No. 1:18-cv-8947 (S.D.N.Y.), filed September 29, 2018.

15.     As a result of the misconduct described herein, current members of Tesla's Board are antagonistic to this lawsuit such that making a demand on the Board would be futile.  Each of the Individual Defendants faces a substantial likelihood of non-exculpated liability for their breaches of fiduciary duty disabling the current Board members from impartially considering the subject matter of this lawsuit.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332(a)(2) because complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This court also has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with Delaware so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a

substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Tesla, occurred in this District and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## PARTIES

20.     Plaintiff is a shareholder of Tesla, was a shareholder of Tesla at the time of the wrongdoing alleged herein, and has been a shareholder of Tesla continuously since 2010. Plaintiff is a citizen of Pennsylvania.

21.     Nominal defendant Tesla is a Delaware corporation with its headquarters at 3500 Deer Creek Road, Palo Alto, California 94304.  Tesla was founded in 2003 and went public on June 29, 2010.  Tesla utilizes a proprietary technology to create highway capable electric vehicles as well as clean energy generation and storage products.

22.     Defendant E. Musk is the Chairman, Product Architect and CEO of Tesla and is also the Company's largest stockholder.  E. Musk co-founded Tesla and continues to oversee the company's product strategy -- including the design, engineering and manufacturing aspects of the business.  As Chairman and Product Architect, E. Musk helped design the Company's Tesla Roadster.  In October 2008, he took on the additional responsibility of CEO, overseeing daily operations as the Company was ramping up Roadster production and accelerating the development of its second vehicle, the Model S.  In addition to his Tesla duties, he serves as CEO and Chief Technology Officer ("CTO") of SpaceX, and E. Musk is also the Chairman of SolarCity.  Upon information and belief, E. Musk is a citizen of California.

23.     Defendant Brad W. Buss ("Buss") currently is and has been since 2009, a director of Tesla.  Buss also serves on the Company's Nominating and Governance Committee, the Compensation Committee and the Audit Committee.  Buss was chief financial officer, corporate secretary and executive vice president of finance and administration at Cypress Semiconductor Corp. from August 2005 to 2014.  Before joining Cypress, Buss was vice president of finance at semiconductor company Altera Corp., where he was active in all aspects of the business including forging alliances and guiding strategic direction for global supply chain and sales channel management.  Buss also serves as a director for Advance Auto Parts, Inc. and Marvell Technology Group Ltd.  Upon information and belief, Buss is a citizen of California.

24.     Defendant Robyn M. Denholm ("Denholm") is and has served as a director since August 2014.  Denholm also serves a Chair of the Audit Committee and a member of the Nominating and Governance Committee and the Compensation Committee.  Since January 2017, Denholm has been Chief Operations Officer of Telstra Corporation Limited, a telecommunications company.  Prior to Telstra, from August 2007 to February 2016, Denholm was with Juniper Networks, Inc., a manufacturer of networking equipment ("Juniper"), serving first as its executive vice president and chief financial officer and then as its executive vice president and chief financial operations officer.  Prior to joining Juniper, Denholm served in various executive roles at Sun Microsystems, Inc. from January 1996 to August 2007.  Denholm also served at Toyota Motor Corporation Australia for seven years and at Arthur Andersen & Company for five years in various finance assignments.  From April 2016 until April 2017, Denholm was also a director of ABB Ltd.  Ms. Denholm is a Fellow of the Institute of Chartered Accountants of Australia and holds a Bachelor's degree in Economics from the University of

Sydney and a Master's degree in Commerce from the University of New South Wales.  Upon information and belief, Denholm is a citizen of Australia.

25.      Defendant Ira Ehrenpreis ("Ehrenpreis") is and has been since 2007, a director of Tesla.  Ehrenpreis also serves as Chairman of both the Company's Nominating and Governance Committee and the Compensation Committee.  Ehrenpreis has been a General Partner with Technology Partners since 1996.  He leads the firm's Cleantech investment practice, investing in Energy Technology, Water Technology, and Advanced Materials opportunities.  In the venture capital community, Ehrenpreis serves on the Board and Executive Committee of the National Venture Capital Association ("NVCA") and on the Board of the Western Association of Venture Capitalists ("WAVC").  Ehrenpreis is also the Co-Chairman of both the VCNetwork and the YVCA, two non-profit organizations comprising more than 1,000 venture capitalists.  In the Cleantech sector, Ehrenpreis has served on several industry Boards, including the Clean-Tech Investor Summit (2005, 2006, 2007, 2008, 2009, and 2010 Conference Chairman), Cleantech Venture Network (Past Chairman of Advisory Board), ACORE (American Council on Renewable Energy), Energy Investors Forum (Past Conference Chairman), Energy Venture Fair, and California Climate Change Advisory Board.  Ehrenpreis has also served on the Advisory Boards of the Southern California Tech Coast Alliance, Forum for Women Entrepreneurs (FWE), and the Comerica Venture Capital Advisory Board.  Ehrenpreis is also an active leader at Stanford University, where his contributions have included teaching the course on Venture Capital and serving on the Board of Visitors of Stanford Law School.  Upon information and belief, Ehrenpreis is a citizen of California.

26.      Defendant Antonio J. Gracias ("Gracias") is and has been since 2007, a director of Tesla.  Gracias is also a member of the Company's Audit Committee, the Nominating and

Governance Committee and the Compensation Committee.  Gracias also serves as Valor's Chief Executive Officer and Chairman of the Investment Committee.  Gracias's duties include overall responsibility for the Firm's management, operations, and investing.  These include but are not limited to: human resources, management of the Firm's board, raising capital, limited partner communication, deal generation, investment selection, investment strategy, investment committee management, transaction structuring, and portfolio company management and improvement.  Gracias has over 15 years of experience investing in a variety of sectors including private equity, public equity, and real estate transactions.  Gracias is Valor's Founder and Chief Executive Officer.  Prior to founding Valor in 2001, Mr. Gracias served as Founder and Managing Member of MG Capital from 1995 through 2000.  MG Capital was a private equity firm headquartered in Chicago, Illinois.  As the lead transaction principal, Gracias sourced investments in nine middle market manufacturing companies where MG Capital played the role of lead equity sponsor.  In addition, Gracias served as Chief Executive Officer of Industrial Powder Coatings, Inc., a $65 million revenue supplier to the auto parts and appliance sectors. Prior to MG Capital, Gracias was an Associate with Goldman, Sachs & Co. in New York where he served the firm's institutional clients in the International Equity Division.  Gracias is a member of the Commercial Club of Chicago, a member of the Board of Directors of the Grand Victoria Foundation, a member of the Board of Trustees of the Illinois Institute of Technology, a member of the Board of Directors of The Economic Club of Chicago, a Trustee of the Field Museum, and a member of the Board of Visitors of the University of Chicago Law School. Gracias is also a member of several Valor portfolio company boards.  Upon information and belief, Gracias is a citizen of Illinois.

27.     Defendant Steve Jurvetson ("Jurvetson") is and has been since 2009, a director of Tesla.  At times relevant hereto, Jurvetson has also served as a member of the Company's Audit Committee.  Jurvetson is a managing director of Draper Fisher Jurvetson, a venture capital firm and one of the most active energy and clean tech investors, with affiliate offices around the world and $6 billion under management. Jurvetson was the founding venture investor in Hotmail, Interwoven and Kana.  Jurvetson also led the firm's investments in Tradex and Cyras.  Previously, Jurvetson was an R&D engineer at Hewlett-Packard, where seven of his communications chip designs were fabricated.  His prior technical experience also includes programming, materials science research and computer design at HP, the Center for Materials Research, and Mostek.  He has also worked in product marketing at Apple and NeXT.  According to the Company's 2018 proxy statement, Jurvetson "has been on a leave of absence from the Board since November 2017."  Upon information and belief, Jurvetson is a citizen of California.

28.     Defendant James Murdoch ("Murdoch") is and has been since 2017, a director of Tesla.  Murdoch is also a member of Tesla's Audit Committee.  Murdoch is currently CEO of 21st Century Fox ("21CF").  Before becoming CEO of 21CF in 2015, Murdoch held a number of leadership roles at the company.  Upon information and belief, Murdoch is a citizen of New York.

29.     Defendant Kimbal Musk ("K. Musk") is and has been since 2004, a director of Tesla and is the brother of defendant E. Musk.  K. Musk is the co-founder of The Kitchen.  K. Musk and his brother, E. Musk, started their first company, Zip2, an early content management company for the Internet, in 1995.  It was the first company to bring vector-based maps and door-to-door directions to the internet, and it built the online content management systems

behind more than 100 media companies, including *The New York Times*. Zip2 was sold for $307 million in cash in 1999, one of the largest transactions of its kind in the internet industry. Since then, K. Musk has helped found, advised, and invested in several young companies. K. Musk's prior and current board seats, in addition to Tesla Motors, are Medium, Inc., Everdream Corp., BlackBook Media, SpaceX Corp., Chipotle, and ProgressNow.org. Upon information and belief, K. Musk is a citizen of Colorado.

30.     Defendant Linda Johnson Rice ("Rice") is and has been since 2017, a director of Tesla. Rice is also a member of the Company's Compensation Committee. Rice is currently Chair and CEO of Johnson Publishing Company ("JPC"). In addition to her role as Chair and CEO of JPC and Fashion Fair Cosmetics, Rice is CEO of Ebony Media Operations and chairman emeritus of EBONY Media Holdings, the parent company for the EBONY and Jet brands. Rice has also previously served on boards of companies including Bausch & Lomb, Continental Bank, Quaker Oats, Dial Corporation, MoneyGram and Kimberly-Clark Corporation and currently serves on the boards of Omnicom Group and Grubhub. Rice is a trustee at the Art institute of Chicago, president of the Chicago Public Library Board of Directors, Council Member of The Smithsonian's National Museum of African American History and Culture, and board member of After School Matters and Northwestern Memorial Corporation. Upon information and belief, Rice is a citizen of Illinois.

31.     The defendants identified in ¶¶ 22 to 30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers, directors and/or fiduciaries of Tesla and because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed Tesla and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Tesla in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Tesla and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.     Each director and officer of the Company also owes to Tesla and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tesla, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and directorial positions with Tesla, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper practices of Tesla.

35.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tesla, and was at all times acting within the course and scope of such agency.

36.     To discharge their duties, the officers and directors of Tesla were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Tesla were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Tesla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

37.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Tesla, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the relevant time period has been ratified by the remaining Individual Defendants who collectively comprised all of Tesla's Board during the relevant time period.

38.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business, operations and prospects as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct by causing the Company to conceal the true facts as alleged herein.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law and breaches of fiduciary, to conceal adverse information concerning the Company's operations, financial condition and future business prospects, and to artificially inflate the price of Tesla common stock so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

41.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective internal control policies and procedures with respect to the Company's public statements to its shareholders and the investing community.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tesla, and was at all times acting within the course and scope of such agency.

## FACTUAL ALLEGATIONS

### THE INDIVIDUAL DEFENDANTS ALLOW E. MUSK TO UTILIZE TWITTER TO COMMUNICATE WITH MILLIONS OF PEOPLE AS TESLA'S SPOKESPERSON WITHOUT ANY CONTROLS OR PROCEDURES

44.     Tesla was formed by Silicon Valley entrepreneurs in 2003 with the goal of developing, marketing and selling fully electric automobiles.  By October 2008, Tesla was controlled by defendant E. Musk, who, despite having no prior background in the automobile industry, added the title CEO to his titles of Chairman and "Product Architect."

45.     Tesla has two operating and reportable segments: (i) automotive, which designs, manufactures, markets, and sells fully electric vehicles; and (ii) energy generation and storage, which offers a full suite of energy products that incorporate solar, storage and grid services.

46.     E. Musk, who has gained near celebrity status in recent years, is widely recognized as the leader and brains behind Tesla electric car and solar panel operations.  The Company itself has acknowledged that it is "highly dependent on the services of E. Musk" –

Tesla's Board Chairman and largest stockholder and that such reliance constitutes one of Tesla's business risks.  *See* Form 10-Q, filed August 6, 2018.

47.     Capitalizing on his celebrity status, E. Musk created a profile on the social media application Twitter (twitter.com/elonmusk) in 2009, which he uses to communicate with millions of people about Tesla's business.  Tesla's CFO described E. Musk's Twitter statements as a "strong channel of marketing" with E. Musk acting as a "spokesman" for Tesla.

48.     On November 5, 2013, Tesla Filed a Form 8-K with the SEC stating that it intended to use E. Musk's Twitter account as a means of announcing material information to the public about Tesla and its products and services and has encouraged investors to review the information about Tesla published by E. Musk on his Twitter account.

49.     Since that time, E. Musk has used his Twitter account to distribute material information about Tesla, such as financial projections and non-financial metrics, including production forecasts, production achievements, and new product releases.  By August 2018, E. Musk had more than 22 million Twitter followers.  His tweets were published instantaneously and publicly available to anyone with access to the Internet.

50.     The Individual Defendants gave E. Musk, carte blanche to make public statements about Tesla.  E. Must did not routinely consult with anyone at Tesla before publishing Tesla related information via his Twitter account.  Likewise, no one at Tesla reviewed E. Musk's tweets prior to publication.  The Individual Defendants failed to implement any disclosure controls, procedures or protocols to assess whether the information published by E. Musk via his Twitter account was required to be disclosed in Tesla's Exchange Act reports within the time periods specified by the Commission's rules and forms.  Nor did Tesla have sufficient processes in place to ensure the information E. Musk published via Twitter was accurate or complete.

Indeed, since 2009, *Tesla has had no corporate policies that specifically addressed E. Musk's use of Twitter.*

### E. MUSK'S INCREASINGLY ERRATIC STATEMENTS

51.     Without any oversight, policies, procedures or controls for the last nine years, E. Musk's public statements have long gone unchecked.  E. Musk has been described as a habitual tweeter, his tweets increasing year over year since 2011.  Among big-company tech CEOs, only Salesforce CEO Marc Benioff tweets more than E. Musk.  An unusually large proportion of E. Musk's tweets are replies according to *The Wall Street Journal* and he will reply to anyone. Over the past year, he has replied to more users with fewer than 500 followers than to those with more than 2,000, *The Wall Street Journal* reports.  E. Musk also uses Twitter to hurl insults and to make personal confessions: "A little red wine, vintage record, some Ambien . . . and magic!" he tweeted on June 6, 2017.

52.     E. Musk's public statements and tweets and have become increasingly erratic, over the last twelve months.

53.     In April 2018, he revealed that he was sleeping in the Tesla factory to work on Model 3 production problems.

54.     On April 1, 2018 he tweeted an April Fools' Day prank that Tesla went bankrupt. The next day, Tesla's shares dropped more than 7 percent.

55.     Then, in early May 2018, he took to Twitter to spar with Warren Buffett over investment strategy in a nonsensical tweet storm involving "candy" and "moats."  "I am super serious" E. Musk tweeted on May 5, 2018.  He continued on May 6, 2018, "Then I'm going to

build a moat & fill it w candy.   Warren B will not be able to resist investing!   Berkshire Hathaway kryptonite."

56.     Similarly, in a May 2, 2018 conference call, E. Musk refused to take questions from analysts about Tesla's capital requirements, saying "boring questions are not cool."   The Company's stock was down $25 a share at times the following day.   Cowen analyst Jeffrey Osborne dubbed Wednesday's call, in which E. Musk talked of "barnacles, flufferbots and bonehead bears," surreal.   Morgan Stanley's Adam Jonas said it was the most unusual call he had heard in 20 years in the business.   E. Musk "refused to address analyst questions on capex, cash burn and other "boring bonehead questions," according to Osborne.

57.     During one particular week in late May 2018, E. Musk embarked on a furious anti-media rant, pledging to create a Soviet-style site to scrutinize journalists, and suggesting oil companies and other automakers help fuel critical coverage of Tesla.   "The holier-than-thou hypocrisy of big media companies who lay claim to the truth, but publish only enough to sugarcoat the lie, is why the public no longer respects them," E. Musk tweeted which set in motion the following tweets and replies:

> Thought you'd say that.  Anytime anyone criticizes the media, the media shrieks 'You're just like Trump!'  why do you think he got elected in the first place? Because no one believes you any more.  You lost your credibility a long time ago
>
> E. Musk (@elonmusk) May 23, 2018

***

> Problem is journos are under constant pressure to get max clicks & earn advertising dollars or get fired.  Tricky situation, as Tesla doesn't advertise, but fossil fuel companies & gas/diesel car companies are among world's biggest advertisers.
>
> E. Musk (@elonmusk) May 23, 2018

\*\*\*

Going to create a site where the public can rate the core truth of any article & track the credibility score over time of each journalist, editor & publication. Thinking of calling it Pravda . . .

E. Musk (@elonmusk) May 23, 2018

\*\*\*

Create a media credibility rating site (that also flags propaganda botnets)

E. Musk (@elonmusk) May 23, 2018

\*\*\*

For some reason, this is the best I've felt in a while.  Hope you're feeling good too

E. Musk (@elonmusk) May 24, 2018

58.     E. Musk also criticized the United Auto Workers union in another tweet storm in late May 2018, claiming that the union was responsible for driving GM and Chrysler into bankruptcy and suggesting that Tesla workers might lose their stock options if they formed a union.  The "UAW destroyed once great US auto industry & everyone knows it" he tweeted in a May 21, 2018 post.  He all but invited a complaint to the National Labor Relations Board for unfair labor practices by adding, "Nothing stopping Tesla team at our plant from voting union.  Could do so tmrw if they wanted.  But why pay union dues & give up stock options for nothing?"

59.     He also randomly announced March 15 as the release date for Tesla's Model Y vehicle, then added, "I just made that up, because the Ides of March sounded good." "But consider it real.  We could unveil Model Y anytime from late this year to mid next year, so March 15 is about right."

60.     In July 2018, E. Musk's bizarre Twitter tirades continued, this time directed at the hero divers who helped free a Thai soccer team from a flooded cave.  Shares of Tesla stock fell 3.5 percent on July 16, 2018 – $2 billion off the Company's market value – after E. Musk directed abuse on Twitter at one of the British cave divers involved in the rescue of 12 Thai children and their coach the previous week.  James Anderson, a partner at Tesla's fourth largest shareholder, asset manager Baillie Gifford, called the statements "a regrettable instance" and said he had reiterated to the Company the need for "peace and execution" of its core business.  E. Musk's tweets were made on July 15, 2018 and directed toward British-born cave expert Vernon Unsworth, who had spent years exploring the cave in Thailand where the soccer team of 12 boys and their coach were trapped after the cave flooded.

61.     E. Musk's tirade was reportedly triggered by an interview with CNN in which Mr. Unsworth had criticized E. Musk's bid to rescue the boys with a small submarine E. Musk had his team assemble from SpaceX parts:

> Water level was actually very low & still (not flowing) – you could literally have swum to Cave 5 with no gear, which is obv how the kids got in.  If not true, then I challenge this dude to show final rescue video.  Huge credit to pump & dump generator team.  Unsung heros here.
>
> E. Musk (@elonmusk) July 15, 2018

***

> You know what, don't bother showing the video.  We will make one of the mini-sub/pod going all the way to Cave 5 no problemo.  Sorry pedo guy, you really did ask for it.
>
> E. Musk (@elonmusk) July 15, 2018

62.     E. Musk doubled down on his "pedo" or pedophile claim when challenged on Twitter, saying "bet ya a signed dollar it's true."  However, after public criticism, E. Musk

21

deleted the July 15 tweet and on July 18, 2018, published two purported apologies to Mr. Unsworth stating that his "words were spoken in anger."

63.     Inexplicably, E. Musk later retracted his apology and on August 28, 2018, E. Musk was back on Twitter, this time claiming that Mr. Unsworth's failure to take legal action against him was evidence that the pedophile claim was true: "You don't think it's strange he hasn't sued me?  He was offered free legal services.  And you call yourself @yoda . . ."  On September 17, 2018, Mr. Unsworth filed a defamation lawsuit against Musk in the U.S. District Court for the Central District of California, Case No. 2:18-cv-8048.

64.     On August 30, 2018, in an alleged email sent directly to a BuzzFeed News reporter by E. Musk, he reiterated his accusations of pedophilia against Mr. Unsworth:

> From: Elon Musk
> Date: Thu, Aug. 30, 2018 at 6:43 PM
> Subject: RE: BuzzFeed News: Unsworth legal letter
> To: ryan.mac@buzzfeed.com
>
> Off the record
>
> I suggest that you call people you know in Thailand, find out what's actually going on and stop defending child rapists, you fucking asshole. He's an old, single white guy from England who's been traveling or living in Thailand for 30 to 40 years, mostly Pattaya Beach, until moving to Chiang Rai for a child bride who was about 12 years old at the time.  There's only one reason people go to Pattaya Beach.  It isn't where you'd go for caves, but it is where you'd go for something else.  Chiang Rai is renowned for child sex-trafficking.
>
> He may claim to know how to cave dive, but he wasn't on the cave dive rescue team and most of the actual dive team refused to hang out with him.  I wonder why . . .
>
> As for this alleged threat of a lawsuit, which magically appeared when I raised the issue (nothing was sent or raised beforehand), I fucking hope he sues me."

65.     On September 6, 2018, during a podcast interview with the comedian Joe Rogan, E. Musk smoked marijuana and wielded a samurai sword.

66.     Tesla and the Individual Defendants have long acknowledged that maintaining the confidence of consumers and analysts in Tesla's business prospects is crucial.  The Company's Form 10-Q filed on August 6, 2018, emphasized Tesla's need to "maintain confidence among customers, suppliers, analysts, ratings agencies and other parties in our long-term financial viability and business prospects . . . and any negative perceptions about our long-term business prospects, even if exaggerated or unfounded, could harm our business and make it more difficult to raise additional funds if needed."  Given its importance to Tesla's business and E. Musk's widely publicized Twitter antics, the Individual Defendants knew or were reckless in not knowing, that Tesla's utter and complete failure to implement appropriate disclosure controls, if exposed, would pose a massive threat to Tesla's reputation and business prospects.

67.     Nevertheless, and even with knowledge of the inherent risks, for nine (9) years the Individual Defendants gave E. Musk carte blanche to make material public statements about Tesla and failed to implement any corporate policies regarding Musk's Twitter use.

### E. MUSK'S PUBLIC FEUD WITH SHORT SELLERS

68.     It has been argued that short sellers[3] play an important role in the financial market by providing liquidity to markets and preventing stocks from being bid up to inflated high levels on hype or over-optimism.  However, in order to stop short sellers from trading in their stock, companies sometimes engage in a practice known in the industry as "squeezing the shorts."  To

---

[3] Shorting or short selling is the sale of a security that is not owned by the seller or that the seller has borrowed.  The practice is motivated by the belief that a security's price will likely decline, enabling it to be purchased back at a lower price at a profit.  By shorting a stock, short sellers integrate their own experience and interpretation of public information into the market price of that stock, and have on numerous occasions, successfully anticipated stock declines.

that end, a company may attempt to manipulate or inflate its market price to such extent that the short-sellers can no longer afford to maintain their position – that is, they are "squeezed out" and forced to purchase stock to cover their position.

69.     In 2018, stock analysts and investors became increasingly skeptical that Tesla could meet its previously announced production targets and begin to earn sufficient cash in order to sustain its operations and pay its existing debt load.  By August 2018, more than $13 billion worth of Tesla shares were being "shorted," meaning they were sold by investors who did not own them at the time of the sale.

70.     E. Musk has a long-standing public feud with short-sellers and has complained that Tesla is unfairly targeted by short sellers.  He often uses his personal Twitter account to taunt Tesla's skeptics.  For example, on May 4, 2018, he tweeted, "oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time" and that the "sheer magnitude of the short carnage will be unreal.  If you're short, I suggest tiptoeing quietly to the exit[.]"  He also tweeted on June 17, 2018 that Tesla short-sellers had "about three weeks before their short position explodes."   As described herein, these statements were an ill-conceived attempt to artificially manipulate the price of Tesla securities in order to "burn" and "squeeze out" the Company's short-sellers.

**THE SEC REVEALS DETAILS CONCERNING PRELIMINARY DISCUSSIONS TO TAKE TESLA PRIVATE[4]**

71.     Beginning in January 2017, E. Musk engaged in preliminary discussions regarding a transaction to take Tesla private.  The complaint filed against E. Musk by the SEC specifically references "three or four in-person meetings" with E. Musk and representatives of a

---

[4] The details regarding these discussions are recited in the SEC's complaint against E. Musk at ¶¶ 17 – 29 therein.

sovereign investment fund (the "Fund") in January 2017.  As described by the SEC, E. Musk claims that during these meetings the lead representative of the Fund expressed a verbal desire to make a large investment in Tesla and establish a Tesla production facility in the Middle East.

72.     In late July 2018, E. Musk and representatives of the Fund had not spoken for many months.  On July 28, 2018, a representative of the Fund requested a meeting with E. Musk. On the evening of July 31, E. Musk and his chief of staff met with three representatives of the Fund at Tesla's factory in Fremont, California for approximately 30 to 45 minutes.  Tesla's CFO joined midway through the meeting.

73.     According to E. Musk, as described in SEC Complaint, at the meeting the Fund's lead representative told E. Musk that the Fund had recently acquired almost five percent of Tesla's common stock on the open market, expressed interest in taking Tesla private, and confirmed that he was empowered to make investment decisions for the Fund.  E. Musk later stated that he assumed without confirming that the lead Fund representative was proposing a "standard" going-private transaction, but the terms of any such deal were not discussed.

74.     During the July 31 meeting, the lead Fund representative again raised the prospect of establishing a production facility in the Middle East.  According to E. Musk, he expressed openness but made no commitment; E. Musk assumed that whether a Tesla production facility in the Middle East was a precondition to the Fund's willingness to take Tesla private would depend on the amount of capital the Fund was required to commit to the transaction.  E. Musk did not discuss his assumption with the representatives of the Fund.

75.     The July 31 meeting lacked discussion of even the most fundamental terms of a proposed going-private transaction.  For example, there was no discussion at the July 31 meeting of (1) any dollar amount or specific ownership percentage for the Fund's investment in a going-

private transaction; (2) any acquisition premium to be offered to current Tesla shareholders; (3) any restrictions on foreign ownership of a significant stake in Tesla; (4) the Fund's available liquid capital; (5) whether the Fund had any past experience participating in a going-private transaction; (6) any regulatory hurdles to completion of a going-private transaction; or (7) the board approval process necessary to take Tesla private.  E. Musk has acknowledged that the July 31 meeting was the most specific discussion of a transaction to take Tesla private between him and representatives of the Fund.

76.     According to E. Musk, at the close of the July 31 meeting, the lead representative of the Fund asked E. Musk to tell the Fund how he wanted to do a going-private transaction and representative that so long as the terms were "reasonable," the Fund would be fine with them.  E. Musk acknowledged that no specific deal terms had been established at the meeting and that there was no discussion of what would or would not be considered reasonable.  Nothing was exchanged in writing, and there was no discussion of confidentiality.  E. Musk did not communicate with representatives again about a going-private transaction until August 10.

77.     On August 2, 2018, after market close, E. Musk sent an email with the subject, "Offer to Take Tesla Private at $420," to Tesla's Board, CFO and General Counsel. In the email, E. Musk explained his reasons for wanting to take Tesla private, including that being public "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand."  In the email, E. Musk asked that the "matter be put to a shareholder vote at the earliest opportunity" and stated that the "offer expires in 30 days."

78.     According to E. Musk, he calculated the $420 price per share based on a 20% premium over that day's closing share price because he thought 20% was a "standard premium" in going-private transactions.  This calculation resulted in a price of $419, and E. Musk stated

that he rounded the price up to $420 because he had recently learned about the number's significance in marijuana culture and thought his girlfriend "would find it funny, which admittedly is not a great reason to pick a price."

79.     Prior to E. Musk's meeting with Fund representatives on the evening of July 31, Tesla's stock had closed at approximately $298 per share.  Accordingly, at the time of the meeting, the price per share with a $20 premium would have been approximately $358.  Between the July 31 meeting and E. Musk's August 2 email to Tesla's Board, Tesla's share price had increased over 17% following the Company's August 1 earnings announcement.  E. Musk realized that a spike in Tesla's share price might make a going-private transaction not feasible because it would require an investor in the transaction to pay a "premium on a spike."  E. Musk, however, said that he assumed without confirming with the Fund or any other funding source that the 17% spike in Tesla's share price did not affect the feasibility of taking Tesla private at that time.  E. Musk did not discuss a $420 price per share with any potential funding source for a Tesla going-private transaction prior to sending his email to Tesla's Board.

80.     According to E. Musk, he though there was "a lot of uncertainty" regarding a potential going-private transaction at the time of his August 2 email to Tesla's Board, "but it was worth investigating."   He believed at the time that the likelihood of consummation of a transaction was about 50%.

81.     In response to E. Musk's August 2 email about taking Tesla private, Tesla's Board had a telephonic meeting with E. Musk on the night of August 3.  During that call, E. Musk informed the Board that the Fund was interested in funding a going-private transaction.

82.     E. Musk also told Board members that he wanted existing investors to stay with the Company.  According to E. Musk, at least one Board member told him that it would be "really difficult for small investors" to remain shareholders in a private Tesla.

83.     During the August 3 call, E. Musk reportedly told the Board that he wanted to contact existing shareholders to assess their interest in participating in a going-private transaction.  The Board authorized E. Musk to contact certain investors and asked him to report back to the Board on those conversations.

84.     Between the July 31 meeting with representatives of the Fund and the morning of August 7, E. Musk (1) did not have any further substantive communications with representatives of the Fund; (2) did not discuss a going-private transaction at a share price of $420 with any potential funding source; (3) had a conversation with a private equity fund representative about the process, but did not actually contact any additional potential strategic investors to assess their interest in participating in a going-private transaction; (4) did not provide Tesla's Board with a more specific proposal to take Tesla private; (5) did not contact existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) did not formally retain any advisors to assist with a going-private transaction; (7) did not determine whether the retail investors could remain invested in Tesla as a private company; (8) did not determine whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) did not determine what regulatory approvals would be required for such a transaction or whether they could be satisfied.

85.     On August 6, E. Musk discussed a potential going-private transaction with a private equity fund partner with previous experience with such transactions.  During this call, E. Musk mentioned that to execute the potential transaction, the number of Tesla shareholders

needed to be below 300.  At the time, Tesla had over 800 institutional shareholders and many more individual shareholders.  According to the private equity fund partner, the transaction structure that E. Musk was contemplating was "unprecedented" in his experience.

86.    These uncertainties notwithstanding, on Tuesday, August 7, 2018, E. Musk published a series of statements about a transaction to take Tesla private using his personal Twitter account.  As had been the practice for the past nine years, the Individual Defendants, buried their heads in the sand, thereby causing or allowing E. Musk's campaign of misinformation to ensue.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS**

87.    E. Musk's statements about a potential going private transaction were made without consulting first with Tesla's Board, any other employees, or any outside advisors and are a direct and proximate result of the Individual Defendants' nine (9) year-long failure to implement corporate policies regarding E. Musk's Twitter use.

88.    On August 7, 2018, E. Musk posted the following tweet at 12:48 p.m. EST: "Am considering taking Tesla private at $420.  Funding secured."  E. Musk published this tweet in the middle of the day's official market trading.  Immediately thereafter, the trading volume and price of Tesla shares spiked.

89.    During the next few hours, E. Musk made additional statements about the going-private transaction.  At 1:15 p.m. EST, E. Musk responded to another Twitter user's question, "At what price?" by repeating "420."

90.    At approximately 1:23 p.m. EST, about 35 minutes after E. Musk's initial tweet about taking Tesla private, Tesla's CFO sent a text message to E. Musk, "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and

potential investors.   Would it help if [Tesla's head of communications], [Tesla's General Counsel], and I draft a blog post or employee email for you?"  E. Musk responded, "Yeah, that would be great."  Tesla's CFO then replied, "Working on it.  Will send you shortly."

91.   At approximately 1:40 p.m. EST, E. Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

92.   At 2:00 p.m. EST, E. Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private.  Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for which E. Musk serves as CEO] investment."  In response to this tweet, another Twitter user asked, "Could we still invest once private?  E. Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

93.   At 2:07 p.m. EST, E. Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . . "  by tweeting, "Absolutely.  Am super appreciative of Tesla's shareholders.  Will ensure their prosperity in any scenario."

94.   Nasdaq rules specify that listed Companies such as Tesla must notify Nasdaq at least ten minutes prior to publicly releasing material information about corporate events like a proposed going-private action.  Neither E. Musk nor Tesla notified Nasdaq prior to publishing the August 7 tweets.

95.   At 2:08 p.m. EST, Nasdaq halted trading in Tesla shares.

96.     At 2:13 p.m. EST, E. Musk tweeted, "Shareholders could either to sell 420 or hold shares & go private."

97.     A 3:07 p.m. EST, E. Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales.   Hope all shareholders remain.   Will be way smoother & less disruptive as a private company.   Ends negative propaganda from shorts."   Later that day, E. Musk "retweeted" this same statement, causing it to be published again in his Twitter feed.

98.     At 3:36 p.m. EST, he added, "Investor support is confirmed.   Only reason why this is not certain is that it's contingent on a shareholder vote."

99.     That same day, the Company posted on its corporate blog an e-mail from defendant E. Musk to Tesla employees reiterating his intent to take the Company private at $420 per share.   The email stated in part:

**Taking Tesla Private**

August 7, 2018

*The following email was sent to Tesla employees today:*

Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share.   I wanted to let you know my rationale for this, and why I think this is the best path forward.

First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best.   As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders.   Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term.   Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

***

First, I would like to structure this so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%).  My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX.  If we were to go private, employees would still be able to periodically sell their shares and exercise their options.  This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla.  They would continue to have separate ownership and governance structures.  However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself.  I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome here where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders  If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us.  Either way, the future is very bright and we'll keep fighting to achieve our mission.

100.    Approximately nine minutes later, at 3:45 p.m. EST, Nasdaq lifted the trading halt on Tesla shares.  After trading resumed, Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time E. Musk first tweeted about taking Tesla private earlier that day.

## THE MARKET REACTS TO E. MUSK'S TWEETS

101.    Investors, stock analysts, and journalists immediately sought clarification of E. Musk's August 7 statements.  At 1:00 p.m. EST, just twelve minutes after E. Musk published his

tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's head of Investor Relations sent a text to E. Musk's chief of staff asking, "Was this text legit?"

102.   At approximately 1:13 p.m. EST, a Tesla investor and friend of E. Musk's chief of staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes later, at approximately 1:32 p.m. eastern time, a business reporter texted E. Musk's chief of staff, "Quite a tweet!  (Is it a joke?)."

103.   At approximately 2:23 p.m. EST, another reporter sent Musk an email with the subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.  Is there an explanation coming?"

104.   After E. Musk tweeted the link to the Tesla blog post, at approximately 5:09 p.m. EST on August 7, an investment bank research analyst emailed Tesla's head of Investor Relations, "In the tweet, he said financing is secured but in the [blog post] he doesn't address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured.'  Yes, there is a firm offer."

105.   At approximately 5:23 p.m. EST, another research analyst emailed Tesla's head of Investor Relations and another Investor Relations employee, "Had some questions/clarifications on today's news and blog post.  Can either of you speak?  A few minutes later, Tesla's head of Investor Relations responded, "[A]part from what has been tweeted and

what was written in a blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct.

106.    After Tesla's head of Investor Relations received another inquiry from another investment bank research analyst at approximately 7:20 pm EST, he asked wither the analyst had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on funding though?"  The head of Investor Relations replied, "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets."

107.    On August 8, 2018, the extent of the Individual Defendants abdication of their fiduciary duties was becoming apparent when certain members of Tesla's Board issued a statement revealing that the Board was still evaluating the prospects of taking Tesla private, and confirmed that such a deal was subject to Board approval.  On the same day, *The Wall Street Journal* published an article entitled "SEC probes Tesla CEF Musk's Tweets," reporting that U.S. regulators were inquiring into whether "Elon Musk was truthful when he tweeted that he had secured funding" for the proposed buyout of Tesla.  According to the report, SEC officials wanted to know if E. Musk had a "factual basis" for posting "that the going-private transaction was all but certain, with only a shareholder vote needed to pull it off."

108.    On news of the SEC probe and Board discussions, Tesla's stock price fell $9.23 per share, or 2.43 percent, to close at $370.34 on August 8, 2018.

109.    On August 9, 2018, *Bloomberg*, published an article entitled "The SEC Is Intensifying Its Probe of Tesla," reporting that SEC regulators were "intensifying its scrutiny of

Tesla Inc.'s public statements in the wake of Elon Musk's provocative tweet Tuesday about taking the electric-car company private."

110. That same day, *Reuters* published an article entitled "Exclusive – Tesla's board seeking more information on Musk's financing plan – sources," reporting that the Company's Board had "not yet received a detailed financing plan from CEO Elon Musk" or "specific information on who will provide the funding."

111. On this news, Tesla's stock price fell an additional $17.89 per share, or 4.83 percent, to close at $352.45 per share on August 9, 2018.

112. Neither E. Musk, nor the Board made any attempt to clarify the August 7, statements until August 13 and E. Musk continued to publish statements on Twitter, including an apparent joke on August 10 about "Short shorts coming soon to Tesla merch[andise]."

113. On August 13, 2018, E. Musk tweeted, "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."

114. Also on August 13, 2018, a blog post attributed to E. Musk called "Update on Taking Tesla Private" was published on Tesla's public blog. In the blog post, E. Musk attempted to walk back on his August 7 statements, stating publicly for the first time that when he had tweeted, "Am considering taking Tesla private at $420. Funding secured," it was based on his impression that there was "no question" that a deal with Fund could be closed and that it was "just a matter of getting the process moving."

115. E. Musk's August 13 post disclosed for the first time that he was still in discussions about taking Tesla private with the Fund and a number of other investors and that no detailed proposal had been presented to the Board or any Board committee. This was contrary to

E. Musk's August 7 tweet stating, "Only reason why this is not certain is that it's contingent on a shareholder vote."

116.    The August 13 blog post also failed to disclose that the $420 price had not been agreed to by any potential funding source for a transaction to take Tesla private.  Similarly, in the blog post, E. Musk again stated that his "proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $42 per share buyout used only for shareholders who preferred that option."  E. Musk did not disclose that he had still not determined whether such a structure would be possible.  After abandoning the going-private transaction, E. Musk admitted that his assumption that it would be possible for small shareholders to remain invested in Tesla as a private company was a "fundamental misunderstanding."

117.    E. Musk's August 13 post was met with skepticism and on August 14, 2018, *Bloomberg* published an article entitled "Goldman's Missing Mandate Adds to Clues Musk Tweeted Out of Turn," reporting that neither Goldman Sachs or Silver Lake were yet working with E. Musk pursuant to a signed agreement or in an official capacity when E. Musk said on Twitter late Monday, August 13, 2018, both firms were working with him as financial advisers.

118.    Following these revelations, Tesla's stock price fell $8.77 per share, or 2.46 percent to close at $347.64 per share on August 14, 2018.

119.    On August 16, 2018 after the market close, *The New York Times* published an in-depth interview with E. Musk entitled "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," which revealed the stress Musk had been under, his use of Ambien, and the manner in which the August 7, 2018 tweet had been conceived.  The interview stated in part:

Elon Musk was at home in Los Angeles, struggling to maintain his composure. "This past year has been the most difficult and painful year of my career," he said. It was excruciating."

\*\*\*

Asked if the exhaustion was taking a toll on his physical health, Mr. Musk answered: "It's not been great, actually.  I've had friends come by who are really concerned."

The events set in motion by Mr. Musk's tweet have ignited a federal investigation and have angered some board members, according to people familiar with the matter.  Efforts are underway to find a No. 2 executive to help take some of the pressure off Mr. Musk, people briefed on the search said.  *And some board members have expressed concern not only about Mr. Musk's workload but also his use of Ambien, two people familiar with the board said*.

\*\*\*

In the interview, Mr. Musk provided a detailed timeline of the events leading up to the Twitter postings on Aug. 7 in which he said he was considering taking the company private at $420 a share.  He asserted that he had "funding secured" for such a deal – a transaction likely to be worth well over $10 billion.

That morning, Mr. Musk woke up at home with his girlfriend, the musician known as Grimes, and had an early workout.  Then he got in a Tesla Model S and drove himself to the airport.  En route, Mr. Musk typed his fateful message.

Mr. Musk has said he saw the tweet as an attempt at transparency. *He acknowledged Thursday that no one had seen or reviewed it before he posted it.*

\*\*\*

What Mr. Musk meant by "funding secured" has become an important question. Those two words helped propel Tesla's shares higher.

But that funding, as it turned out, was far from secure.

Mr. Musk has said he was referring to a potential investment by Saudi Arabia's government investment fund.  Mr. Musk had extensive talks with representatives of the $250 billion fund about possibly financing a transaction to take Tesla private – maybe even in a manner that would have resulted in the Saudis' owning most of the company.  One of those sessions took place on July 31 at the Tesla factory in the Bay Area, according to a person familiar with the meeting.  But the Saudi fund had not committed to provide any cash, two people briefed on the discussions said.

\*\*\*

Mr. Musk's tweet kicked off a chain reaction.

An hour and 20 minutes after the tweet, with Tesla's shares up 7 percent, the Nasdaq stock exchange halted trading, and Tesla published a letter to employees from Mr. Musk explaining the rationale for possibly taking the company private. When the shares resumed trading, they continued their climb, ending the day with an 11 percent gain.

The next day, investigators in the San Francisco office of the Securities and Exchange Commission asked Tesla for explanations.  Ordinarily, such material information about a public company's plans is laid out in detail after extensive internal preparation and issued through official channels.  Board members, blindsided by the chief executive's market-moving statement, were angry that they had not been briefed, two people familiar with the matter said.  They scrambled to cobble together a public statement trying to defuse a mounting uproar over the seemingly haphazard communication.

*\*\**

The S.E.C. investigation appears to be intensifying rapidly.  Just days after the agency's request for information, Tesla's board and Mr. Musk received S.E.C. subpoenas, according to a person familiar with the matter.  Board members and Mr. Musk are preparing to meet with S.E.C. officials as soon as next week, the person said.

*\*\**

He blamed short sellers – investors who bet that Tesla's shares will lose value – for much of his stress.  He said he was bracing for "at least a few months of extreme torture from the short-sellers, who are desperately pushing a narrative that will possibly result in Tesla's destruction."

Referring to short-sellers, he added: "They're not dumb guys, but they're not supersmart.  They're O.K.  They're smartish."

*\*\**

To help sleep when he is not working, Mr. Musk said he sometimes takes Ambien.  "It is often a choice of no sleep or Ambien," he said.

***But this has worried some board members, who have noted that sometimes the drug does not put Mr. Musk to sleep but** instead **contributes to late-night Twitter sessions, according to a person familiar with the board's thinking.  Some board members are also aware that Mr. Musk has on occasion used recreational drugs, according to people familiar with the matter***.

120.    On that same day, *The Wall Street Journal* reported that the "SEC is investigating

whether Mr. Musk intentionally misled investors when he tweeted about the proposal in a bid to

hurt short-sellers by driving up Tesla's stock price," citing a person familiar with the matter. The article further stated that "regulators are pressing Tesla's directors to reveal how much information Mr. Musk shared with them before he tweeted about it last week."

121.    On this news, Tesla's stock price fell $29.95 per share or 8.92 percent, to close at $305.50 per share on August 17, 2018.

**THE TRUTH IS REVEALED**

122.    The SEC's complaints against E. Musk and Tesla confirm that in reality, E. Musk's statements that funding for his going-private transaction was "secured" and investor support was "confirmed" were materially false and misleading. Indeed, the SEC complaints affirm that E. Musk had no "secured" or "confirmed" commitment from any source to provide any amount of funding. In addition, he had never even discussed taking Tesla private at a price of $420 per share with the Fund or any other potential investor.

123.    The SEC complaints also detail also how E. Musk's statement, "Only reason why this is not certain is that it's contingent on a shareholder vote," was also false and misleading. In fact, the complaints state, there were ***numerous*** reasons in addition to a shareholder vote why a going-private transaction was not "certain" at that time. Any going private transaction would have required approval of Tesla's Board or a specially-appointed committee of the Board, and at that time, no formal proposal to take Tesla private had even been presented for consideration. In fact, no deal terms had been agreed upon with any source of funding, and any large investment to fund such a transaction would likely have been predicated on terms that the parties would have to negotiate and agree upon. For example, the Fund had indicated that its investment might be contingent on Tesla building a production facility in the Middle East, a condition that would have significantly complicated any transaction, and to which neither E. Musk nor Tesla had

agreed.  According to the SEC, at least one Board member described such a condition as a "non-starter."

124.    E. Musk's August 7 statements, taken together, also created the misleading impression that certain terms of a transaction to take Tesla private had been determined when, in fact, they had not even been explored, and in some cases, proved to be impossible.  On August 7, E. Musk repeatedly stated that all current Tesla investors would be able to remain invested in Tesla after a going-private transaction.

125.    Specifically, E. Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private.  Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX investment."  E. Musk also responded to another Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company . . . ."  by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders.   Will ensure their prosperity in any scenario."   E. Musk also tweeted, "Shareholders could either to [sic] at 420 and hold shares & go private." Finally, in his August 7 blog post, E. Musk stated " . . . all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share. . . ."

126.    E. Musk also responded to a Twitter user who asked, "Could we still invest once private?" by tweeting, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

127.    The SEC's complaints confirm that at the time of these statements, E. Musk had not determined or even explored whether it would be possible (1) for individual investors to invest in Tesla if it was a private company; (2) for all current Tesla shareholders to remain

invested if Tesla were to go private; (3) to create a "special purpose fund enabling anyone to stay with Tesla;" or (4) to hold liquidity events "every 6 months or so."  In fact, E. Musk later admitted, "I thought the vast majority of existing investors would want to maintain their stake, and we would find a vehicle for small investors to participate.  That latter part was a fundamental misunderstanding that I just did not know – I thought there would be some way to retain small investors, but there isn't."  Musk's statements regarding specific terms of a transaction to take Tesla private created the misleading impression that these terms had been decided upon, when in fact, they had not even been investigated or determined to be possible.

128.    According to the SEC, E. Musk's statements were premised on a long series of baseless assumptions and were contrary to facts that E. Musk knew.  Namely, between the July 31 meeting with representatives of the Fund and his August 7 misstatements, E. Musk knew that he (1) had not agreed upon any terms for a going private transaction with the Fund or any other funding source; (2) had no further substantive communications with representatives of the Fund beyond their 30 to 45 minute meeting on July 31; (3) had never discussed a going private transaction at a share price of $420 with any potential funding source; (4) had not contacted any additional potential strategic investors to assess their interest in participating in a going private transaction; (5) had not contacted existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (8) had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) had not determined what regulatory approvals would be required or whether they could be satisfied.

129.    As described by the SEC, E. Musk's tweets caused "market chaos."  Immediately prior to musk's August 7 statements via Twitter, Tesla's stock was trading at $356.67.  E. Musk's first tweet about taking Tesla private set off a trading frenzy, and the trading volume and

price of Tesla shares immediately spiked.  Nasdaq subsequently halted Tesla trading for more than 90 minutes pending an official announcement from Tesla.  At the end of August 7, after E. Musk's tweets and the post on Tesla's blog, the stock closed at $379.57, up 6.42% from just prior to the first tweet.  By the close of market trading on August 13, after E. Musk and Tesla disclosed more information about the details underlying E. Musk's "funding secured" statement, Tesla's stock price had declined to around pre-tweet trading levels.

130.    On August 24, 2018, after the market close, the Company revealed through a post on its corporate blog that the Company would remain public, adding that existing shareholders believed the Company to be "better off as a public company."

131.    *The Associated Press* commented on this revelation the following day: "First it was the shocking tweet that funding was secured and Tesla may go private, then a statement that the money was locked down after all.  Two weeks later it's never mind, the whole deal is off…. Chaos, though comes with a price.  Experts say it all could wind up with Tesla exposed to a fine for misleading investors.  And even though Musk has almost legendary status, the episode could further erode his credibility with stakeholders who have endured multiple broken promises and years of losses as a public company."

132.    By the close of trading on August 27, the first trading day after E. Musk announced that he was abandoning his proposal to take Tesla private, Tesla's stock had dropped to $319.44.

133.    On September 27, 2018 and September 29, 2018, respectively, the SEC filed lawsuits against E. Musk and Tesla alleging violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder against E. Musk and violations of Rule 13a-15 of the Exchange Act against Tesla.

134.    Even with charges of securities fraud looming, the Board proved reluctant to exercise oversight over E. Musk and reign him in to prevent further harm to Tesla.  On October 2, 2018, *The New York Times* published an article titled "Elon Musk's Ultimatum to Tesla: Fight the S.E.C., or I Quit."

Securities and Exchange Commission officials were understandably taken aback on Thursday morning when Tesla's board — and its chairman, Elon Musk — abruptly pulled out of a carefully crafted settlement.

After the S.E.C. responded by accusing Mr. Musk, but not the company that he had co-founded, of securities fraud, *the board further defied regulators, issuing a provocative statement saying that the directors were "fully confident in Elon, his integrity, and his leadership of the company*."

*It was a stunning reversal: The board had rejected a settlement that was extraordinarily generous* — it would have allowed Mr. Musk to remain as chief executive, and required him to step down as chairman for only two years. Now, the company was at risk of losing Mr. Musk as chairman and chief executive if regulators prevailed in court.

"*What it tells us is this board, as a strategic plan, must be using the Jim Jones-Jonestown suicide pact," Jeffrey Sonnenfeld, a professor at the Yale School of Management, said Friday on CNBC. "They are drinking the Kool-Aid of the founder. It is completely as self-destructive as Musk is.*"

But Mr. Musk had given the board little choice: In a phone call with directors before their lawyers went back to federal regulators with a final decision, Mr. Musk threatened to resign on the spot if the board insisted that he and the company enter into the settlement. Not only that, he demanded the board publicly extol his integrity.

Threatened with the abrupt departure of the man who is arguably Tesla's single most important asset, *the board caved to his demands*, according to three people familiar with the board's decision.

The next day, Tesla's lawyers were back at the S.E.C., all but groveling for a second chance — this time with Mr. Musk's grudging approval.

One factor in Mr. Musk's change of heart: Tesla's stock plunged Friday morning as investors absorbed news of the rejected settlement and the possibility that the S.E.C. would force Mr. Musk to step down. It would finish down almost 14 percent on Friday.

On Saturday, the company and Mr. Musk finally agreed to settle the matter, ending a crisis that began with Mr. Musk's now-infamous Twitter post saying that he had "funding secured" for a buyout at $420 a share.

*Mr. Musk's 48 hours of obstinance came at a significant price to him and the company. They had passed on Thursday's generous offer, and the S.E.C. felt compelled to extract greater concessions. The ban on Mr. Musk's serving as chairman went from two years to three, and his fine doubled to $20 million. Tesla will also pay a $20 million fine, and Mr. Musk agreed to personally buy the same amount in Tesla stock.*

The S.E.C. is also requiring the company to add two independent directors and to elect an independent director as chairman.

"*Rejecting such a favorable settlement is proof that he needs monitoring*," said John C. Coffee Jr., a professor at Columbia Law School. "He didn't have a legal leg to stand on, and I'm sure his lawyer told him that. *But he got very touchy about not being able to proclaim his innocence.*"

*From Mr. Musk's view, that had been a crucial problem with a settlement from the beginning. Mr. Musk neither admitted nor denied guilt as part of the agreement, and he cannot publicly* contest *the S.E.C.'s allegations. He cannot say, as he did on Thursday, that "I have always taken action in the best interests of truth, transparency and investors" and "the facts will show I never compromised this in any way."*

Tesla's stock has rebounded this week, reflecting investors' relief that Mr. Musk will remain as chief executive while the company puts mechanisms in place to curb his increasingly impulsive behavior. The board will closely watch Mr. Musk's communications with investors, and establish a permanent committee responsible for, among other things, monitoring disclosures.

But it remains to be seen how effective the board can be, given Mr. Musk's erratic temperament and his dominant role in the company.

***

*In the end, it took legal action by the S.E.C. to accomplish what had been increasingly obvious to most Tesla observers, including many of Tesla's own directors: For all his brilliance, Mr. Musk's reckless impulses must be kept in check.*

135.     Just two days after settling the fraud charges with the SEC,  E. Musk had already raised eyebrows by tweeting out the video for "OPP," a 1990s hip hop song by the group

"Naughty by Nature," along with a winking emoji at 1:22 a.m. PST, in an apparent reference to sexual promiscuity, which E. Musk left open to interpretation by investors.

136.    On October 4, 2018, less than one week after settling fraud charges with the SEC, E. Musk derided the agency on Twitter: "Just want to [say] that the Shortseller Enrichment Commission is doing incredible work.  And the name change is so on point!"

## DAMAGES TO THE COMPANY

137.    As a result of the Individual Defendants' breaches of fiduciary duty, the Company has suffered, and continues to suffer, extensive damage.

138.    Tesla has expended and will continue to expend significant sums of money that it otherwise would not have spent.  Such expenditures include, but are not limited to:

a)    costs incurred in investigating and defending Tesla and certain officers in the federal securities fraud actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Tesla's artificially inflated stock price and the misapprehension that the Individual Defendants were acting in compliance with their fiduciary duties; and

c)    costs and monetary penalties incurred to satisfy the judgment resulting from the SEC litigation.

139.    As a result of the Individual Defendants' misconduct, Tesla's corporate image and goodwill have also been irreparably damaged.

## DEMAND IS FUTILE

140.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.   Presently, the Board consists of the following eight (8) individuals: E. Musk, Buss, Denholm, Ehrenpreis, Gracias, Murdoch, K. Musk and Rice.[5] Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged herein and, therefore, such a demand is excused.

141.    As specified herein, demand is excused because this Verified Shareholder Derivative Complaint alleges with particularity that at least half of the members of the current Board breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.   Indeed, during the relevant period the Individual Defendants caused or allowed the Company to fail to maintain proper internal controls and oversight mechanisms and to issue false and misleading statements.   The Individual Defendants' misconduct has severely damaged the Company.   Lawsuits alleging violation of the federal securities laws have been filed against the Company and Tesla incurred a $20 million monetary fine to settle the SEC's charges. Further, and more importantly, Tesla's reputation and goodwill have been tainted by the misconduct described herein.

142.    During the relevant period, the Audit Committee consisted of defendants Buss, Gracias, Jurveston, Denholm, Rice, K. Musk, E. Musk and Murdoch with defendants Buss and Denholm the designated Audit Committee Financial Experts.   Among other things, the Audit Committee is responsible for "Reviewing the reports of management, internal audit and the

---

[5] Although he continues to be listed as a director on Tesla's website, The Company's 2018 proxy statement confirms that defendant Jurvetson has been on leave from the Board since November 2017.   Therefore, the futility of pre-suit demand should be assessed against the remaining eight (8) active members of the Board.   Allegations of Jurvetson's lack of independence and disinterestedness herein support the breach of fiduciary duty claims asserted against him and interrelationships with Tesla and other current members of the Board.

independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting;" "Reviewing, prior to announcement, Company press releases and other disclosures containing financial information;" and "overseeing financial risk exposures, including monitoring the Company's financial condition and investments, the integrity of the Company's financial statements, accounting matters, internal controls over financial reporting" and "guidelines and policies with respect to risk assessment and risk management."

143.    Tesla's most recent proxy statement filed April 26, 2018 claims that the "board sets high standards for Tesla's employees, officers and directors. Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company and managing its affairs consistent with high principles of business ethics. According to the Company's Corporate Governance Guidelines, the Board's "fundamental responsibility" is to:

> …exercise their business judgment to act in what they reasonably believe to be the best interests of Tesla and its stockholders. It is the duty of the Board to oversee management's performance to ensure that Tesla operates in an effective, efficient and ethical manner.

144.    In addition, by its Code of Ethics:

> Tesla aspires to be a "do the right thing" company – in other words, engaging in conduct that your family would be proud of. That higher principle, if followed correctly, pretty much takes care of this whole topic. That said, this Code of Business Conduct and Ethics sets out basic principles that should help anyone working at or for Tesla avoid even the appearance of improper behavior.
>
> ***
>
> Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. You must respect and obey the laws of the places where we operate.

145.    In this vein, the Code of Ethics sets further specific policies as to the CEO:

The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities as specified in the Company's Disclosure Controls and Procedures Policy.

***

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel or the Legal Department or the CEO and to the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Business Conduct and Ethics or of these additional procedures.

146.    Despite their duties and responsibilities, the members of the Board and Audit Committee, failed to ensure that the Company had internal controls, policies and oversight mechanisms in place to prevent the wrongdoing alleged herein.    As such, the Individual Defendants face a substantial threat of liability and cannot fairly consider a demand to commence litigation.

147.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on intentional, reckless and disloyal misconduct.    Thus, none of the Individual Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).    As a majority of the Individual Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this

action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

148.    Read together with the facts summarized above and alleged with particularity herein, pre-suit demand is also excused as futile for the following reasons:

(a)    The principal professional occupation of defendant E. Musk is his employment with Tesla, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Furthermore, the Company admits that E. Musk is not independent in its Proxy Statement filed April 26, 2018.  As of December 31, 2017, E. Musk owned 37,853,041 shares or 21.9% of the Company's shares, is Tesla's largest stockholder, and exercises domination and control over all of the entire Board rendering each of the Individual Defendants not independent.

(b)    The Individual Defendants concede that defendant K. Musk lacks independence as he is the brother of E. Musk.  The familial relationship renders demand futile as to defendants E. Musk and K. Musk.  Additionally, K. Musk lacks independence due to the substantial compensation he receives for serving on Tesla's Board.  As reported in the Company's proxy statements, in 2017 K. Musk received $21,721 in compensation, in 2016 he received $24,535 in compensation and in 2015 he received $4,964,381 in director compensation. K. Musk is also a director of SpaceX and a limited partner of Valor Equity Partners II, L.P. (in which E. Musk has also invested) and Valor Equity Partners III-A, L.P., funds advised by VMC (defined below).

(c)    Defendant Gracias lacks independence as he is the chief executive officer, director and majority owner of Valor Management Corp. ("VMC") which is a minority investor of Space X where Gracias is a director, along with Jurvetson and K. Musk.  Defendant E. Musk

is the Chief Executive Officer, Chief Technical Officer, lead designer and a significant stockholder in SpaceX.  Moreover, Ehrenpreis, as discussed below, is a minority investor in SpaceX.  VMC provided certain consulting services to Tesla relating to operational optimization in 2017 and costs of $34,347 were reimbursed to it as part of those services.  Moreover, VMC was a minority investor in SolarCity where Gracias also served as a director with E. Musk.  At the time of Tesla's acquisition of SolarCity, Gracias beneficially owned 211,854 shares of SolarCity common stock which included (a) 159,023 shares held by AJG Growth Fund, LLC, an investment fund Gracias managed, (b) 38,665 shares held by a Valor private equity fund, Valor Equity Management II, LP, and (c) 14,166 shares issuable upon exercise of options exercisable within 60 days of September 23, 2016.  Furthermore, The Elon Musk Revocable Trust dated July 22, 2003, of which E. Musk is the trustee, is a limited partner of Valor Equity Partners II, L.P. which is a fund advised by VMC.  K. Musk is a limited partner of Valor Equity Partners II, L.P. and Valor Equity Partners III-A, L.P., which are funds advised by VMC.  Gracias has been described as one of Elon Musk's closest friends and E. Musk reportedly gave Gracias the second Tesla Roadster ever made.  In May 2018, proxy advisor Institutional Shareholder Services ("ISS") recommended that investors vote against Gracias citing concerns regarding the lack of performance-based elements in Tesla's pay plan and his role as a compensation committee member, as well as concerns that Gracias is not independent for key Board committees. Defendant Gracias also lacks independence due to the substantial compensation he receives for serving on Tesla's Board As reported in the Company's proxy statements, in 2017 Gracias received $37,500 in compensation, in 2016 he received $37,500 and in 2015 he received $9,790,505 in director compensation.

(d)     Defendant Jurvetson lacks independence as he is a co-founder and was a managing director of Draper Fisher Jurvetson ("DFJ") until November 2017 when he was forced out due to alleged claims of sexual harassment.  DFJ funds are a significant stockholder of SpaceX and Jurvetson is a director of SpaceX.  As discussed *supra*, defendants Gracias and K. Musk are also directors of SpaceX where defendant E. Musk is the Chief Executive Officer, Chief Technical Officer, lead designer and a significant stockholder.  Moreover, Ehrenpreis, as discussed below, is a minority investor in SpaceX.  DFJ participated in the following early venture funding rounds of Space X: $30.44 million Series B (August 11, 2009); $50 million Series C (November 8, 2010); lead investor in $30 million Series D (December 21, 2012); $1 billion Series E (January 20, 2015).  Additionally, DFJ funds are a significant stockholder of SolarCity of which E. Musk is the Chairman.  The Elon Musk Revocable Trust dated July 22, 2003 is a limited partner of Draper Fisher Jurvetson Fund X, L.P., which is managed by DFJ, with a subscription commitment of $250,000.  Jurvetson's lack of independence is also evidenced by DFJ's investment history with SolarCity of which E. Musk was the largest shareholder and served on the Board.  DFJ invested in several of SolarCity's pre-IPO venture funding rounds.[6]  At the time of Tesla's acquisition of SolarCity, funds managed by DFJ beneficially owned 3,308,266 shares of SolarCity's common stock or approximately 3.3% of shares outstanding.  Jurvetson also personally owned 417,450 shares of SolarCity common stock held by the Steve and Karla Jurvetson Living Trust dated August 27, 2002.  Furthermore DFJ invested in Tesla before its 2010 initial public offering ("IPO"), participating in Tesla's Series C

---

[6] DFJ first invested in SolarCity in September 2006 – nearly six years before the company's IPO. The firm then participated in several SolarCity venture capital funding rounds, including: $29.9 million Series D round (November 1, 2008); $23.9 million Series E preferred stock round (October 1, 2009), contributing nearly $4 million; $21.4 million Series E-1 preferred stock round (June 2010), contributing nearly $9 million; and a $20 million Series F preferred stock financing round (June and July 2011), contributing more than $5.9 million.

(closed May 1, 2006), series D (closed May 11, 2007), and Series E (closed February 8, 2008) venture funding rounds.  Not only has DFJ invested in E. Musk and his various businesses, but E. Musk invests in DFJ.  Specifically, the E Musk Trust is a limited partner in the Draper Fisher Jurvetson Fund X, L.P.  Musk is reported to have given Jurvetson the first Tesla Model S ever made, and the second Tesla Model X.  Defendant Jurvetson also lacks independence due to the substantial compensation he receives for serving on Tesla's Board.  As reported in the Company's proxy statements, in 2017 Jurvetson received $27,500 in compensation, in 2016 he received $27,500 in compensation and in 2015 he received $6,095,984 in director compensation. According to the March 28, 2018, memorandum opinion by Vice Chancellor Joseph R. Slights III in *In re Tesla Motors, Inc. Stockholder Litig.*, C.A. No. 12711-VCS, Jurvetson's substantial connections with SpaceX, the complaint's allegations that E. Musk gifted Jurvetson the first Tesla Model S and the second Tesla Model X ever made, along with the fact that DFJ, Jurvetson's venture capital firm, had invested in Tesla three times between 2006 and 2008 and held Tesla stock as recently as late 2014 created "a reasonable inference that Jurvetson is beholden to [E.] Musk and may not have acted independently. . ."

(e)     Defendant Ehrenpreis lacks independence as he is a manager of DBL Partners Fund III ("DBL III").  Ehrenpreis and DBL III are minority investors in SpaceX where defendant E. Musk is the Chief Executive Officer and lead designer.  Ehrenpreis is also a co-owner of DBL Partners.  Another co-owner of DBL Partners is a manger of DBL Investors, which is also an investor in SpaceX.  Ehrenpreis further serves as a member of the board of directors of Mapbox Inc., a provider of custom online maps ("Mapbox").  In December 2015, Tesla entered into an agreement with Mapbox relating to a vehicle map-related project, pursuant to which Tesla made a prepayment of $3 million in 2016 for certain fees.  Tesla will pay Mapbox

to the extent any additional fees for services are incurred in excess of such prepaid fees. Defendant Ehrenpreis also lacks independence due to the substantial compensation he receives for serving on Tesla's Board.   According to the Company's proxy statements, in 2017, Ehrenpreis received $37,500 in compensation, in 2016 he received $37,500 in compensation, and in 2015 he received $7,239,683 in compensation.

(f)      Defendant Buss lacks independence due to the substantial compensation he receives for serving on Tesla's Board.   According to the Company's proxy statements, in 2017 Buss received $3,357,002 in compensation, in 2016 he received $20,000 in compensation and in 2015 he received $4,954,785 in compensation.   Based upon the biographical information provided for Buss on Tesla's website, he does not currently have full time employment and serves only as a director on the boards of Advance Auto Parts, Inc. (where he received $230,000 in director compensation in 2017) and Marvell Technology Group, Ltd. (where he receives a $60,000 annual cash retainer).   Defendant Buss lacks independence due to his employment and interest in Solar City of which E. Musk was the largest shareholder and served on the Board. Buss was the CFO of Solar City from August 2014 until his retirement in February 2016, an employee of Solar City through March 31, 2016 and a consultant of Solar City through at least December 31, 2016.   Buss is indebted to Musk because of, among other things, the $32 million Buss received for 18 months of work as SolarCity's CFO.   Buss further lacks independence as a result of his employment and stake in Cypress Semiconductor Corporation ("Cypress") in which he served as executive vice president of finance and administration and CFO.   In 2013, Cypress provided semiconductors to a third party manufacturer engaged by Tesla to build certain components for use in its Model S vehicle.   This indirect supply relationship continued in 2014. Payments by Tesla to the third party manufacturer in respect of the semiconductors supplied by

Cypress were approximately $35,000 in 2012, $605,000 in 2013 and $817,000 in 2014. Tesla's selection of Cypress's "TrueTouch automotive touchscreen solution for the infotainment system in the Model S" was touted by Cypress as a significant highlight of its third fiscal quarter of 2012. According to Tesla's 2015 proxy statement, Buss was not independent.

(g)    Defendant Denholm lacks independence due to the substantial compensation she receives for serving on Tesla's Board. As reported in the Company's proxy statements, in 2017 Denholm received $4,921,810 in compensation, in 2016 she received $45,000 in compensation, in 2015 she received $4,979,785 in director compensation and in 2014 she received $7,181,066 in compensation as a director of Tesla. Additionally, Denholm was the executive vice president and CFO of Juniper from August 2007 until February 2016, as well as its COO from July 2013 until February 2016. Tesla purchases networking equipment manufactured by Juniper in the ordinary course of business.

(h)    Defendant Rice lacks independence due to the substantial compensation she receives for serving on Tesla's Board. As reported in the Company's proxy statements, in 2017 Rice received $1,933,914 in compensation.

(i)    Directors Buss, Ehrenpreis, Gracias and Jurvetson further lack independence from each other and from E. Musk as a result of their business dealings in connection with Solar City and certain Solar City Agreements. The Proxy Statement filed on April 24, 2014 states, in part, the following:

> We have entered into a number of agreements with SolarCity. Mr. Elon Musk is a significant stockholder of SolarCity and has been its Chairman since July 2006. Mr. Jurvetson, a member of our Board of Directors, is a managing director of Draper Fisher Jurvetson which is a significant stockholder of SolarCity. Mr. Gracias, a member of our Board of Directors, is a minor shareholder of SolarCity and a member of the board of directors of SolarCity. Mr. Straubel, our Chief Technical Officer, is a member of the board of directors of SolarCity.

In January 2011, we entered into a professional services agreement with SolarCity under which Tesla subcontracted with SolarCity for SolarCity to pay Tesla to provide a variety of design, engineering and consulting services as part of a grant under the California Solar Initiative of the California Public Utilities Commission. As of December 31, 2012, all work under this agreement has been completed. Pursuant to this agreement, payment of a portion of the billable amount was deferred until 2013. Accordingly, we recognized approximately $47,000 in revenue under this agreement in 2013.

In the past, we have engaged SolarCity from time to time to install our Superchargers and related equipment, including solar panels provided by SolarCity for use as part of the Superchargers. SolarCity has invoiced Tesla approximately $748,000 for such installation services and equipment provided by SolarCity during 2013.

In September 2012, we entered into a professional services agreement with SolarCity (the "Services Agreement") whereby we agreed to refer to SolarCity our customers who have indicated their intent to consult with SolarCity for the installation of in-home electric vehicle supply equipment for use with Tesla vehicles. Under this agreement, SolarCity agreed to pay us referral fees in respect of each customer who purchases from SolarCity solar photovoltaic equipment or energy efficiency upgrade services. During the 2013 fiscal year, approximately $27,000 in aggregate became payable to us by SolarCity for such referral fees. The Services Agreement did not provide for any payment obligations by Tesla. The Services Agreement expired in September 2013.

In April 2013, we entered into a supply agreement with SolarCity under which we will supply SolarCity with various sizes of stationary batteries for integration with solar panels by SolarCity to create stationary power sources for sale or lease to residential and commercial customers. We received approximately $1.6 million from SolarCity during fiscal year 2013 for stationary batteries we supplied to SolarCity pursuant to this supply agreement.

Additionally, in November 2016, Tesla completed its acquisition of SolarCity in a $2.6 billion all-stock transaction.  At the time E. Musk was the largest shareholder in both Tesla and SolarCity (owning approximately 21.9% of SolarCity's common stock) and his SolarCity shares were converted to $500 million of Tesla shares.  In September 2016, a class action lawsuit was filed in Delaware Chancery Court by Tesla shareholders against the Board and E. Musk challenging the SolarCity deal.  On March 28, 2018, Vice Chancellor Joseph R. Slights III issued a 58-page memorandum opinion stating that:

The combination of well-pled facts relating to Musk's voting influence, his domination of the board during the process leading up to the acquisition against the backdrop of his extraordinary influence within the company generally, the board level conflicts that diminished the board's resistance to Musk's influence, and the company's and Musk's own acknowledgements of his outsized influence, all told, satisfy plaintiffs' burden to plead that Musk's status as a Tesla controlling stockholder is reasonably conceivable.

(j)     Defendants E. Musk, Jurvetson, K. Musk, Ehrenpreis and Gracias also lack independence as a result of their business dealings in connection with SpaceX and certain SpaceX Agreements as described in the Company's proxy statements filed during the relevant time period.   For example, the Proxy Statement filed on April 24, 2014 states, in part, the following:

> Elon Musk, our Chief Executive Officer, Product Architect and Chairman, is also the Chief Executive Officer and a significant stockholder of SpaceX. Steve Jurvetson and Kimbal Musk, two members of our Board of Directors, are also members of the board of directors of SpaceX and Antonio Gracias, another member of our Board of Directors, holds a minority interest in SpaceX and is also a member of the board of directors of SpaceX. SpaceX has from time to time in the past paid for facilities and services expenses on our behalf, for which we subsequently reimbursed SpaceX. SpaceX has also provided us, at no cost, with use of certain enterprise software developed by it.
>
> We also receive rental payments from SpaceX for leasing to SpaceX certain car parking spaces located in the south parking lot of our Los Angeles, CA Design Studio. During the 2013 fiscal year, we received approximately $19,000 in such rental payments.
>
> In February 2014, Tesla and SpaceX entered into an agreement relating to Tesla's use of an aircraft leased and operated by SpaceX (the "Airplane Agreement"). Pursuant to the Airplane Agreement, Tesla will pay SpaceX for its use of the aircraft at rates to be determined by the parties from time to time, subject to rules of the Federal Aviation Administration governing such arrangements. The Airplane Agreement was retroactive to cover Tesla's use of the SpaceX aircraft beginning in September 2013. Tesla paid SpaceX approximately $229,000 under the Airplane Use Agreement for Tesla's use of the plane in 2013.

Similarly, according to the most recent Proxy Statement filed on April 26, 2018:

Since April 2016, SpaceX has invoiced Tesla for our use of an aircraft owned and operated by SpaceX at rates determined by Tesla and SpaceX, subject to rules of the Federal Aviation Administration governing such arrangements. In 2017, Tesla incurred approximately $698,543 of expenses under this arrangement. In addition, SpaceX operates and incurs operating expenses on a separate aircraft owned by Elon Musk. Since August 2017, we have an arrangement with SpaceX pursuant to which we are invoiced for Tesla's use of such aircraft, at rates determined by Tesla and SpaceX, subject to rules of the Federal Aviation Administration governing such arrangements. In 2017, Tesla incurred approximately $46,510 of expenses under this arrangement.

In June 2017, SpaceX entered into an agreement with Tesla to purchase a microgrid energy system and installation services for approximately $1.9 million. In March 2018, SpaceX purchased additional equipment and services from Tesla under this arrangement for approximately $150,000 with all work to be completed in the second quarter of 2018.

## FIRST CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY)

149.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

150.    Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

151.    Under the current circumstances, the Individual Defendants also had a duty to:

(a)    act in the interests of the Company and all of its equity owners; and

(b)    act in accordance with the fundamental duties of loyalty, care and good faith.

152.    Because of their respective positions with the Company, the Individual Defendants also are required to:

(a)      act independently to ensure that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder; and

(b)      ensure that if there are conflicts of interest between the Individual Defendants' interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the Company and its public shareholders

153.    In causing or allowing the Company to fail to maintain adequate internal controls and procedures related to public disclosures, the Individual Defendants have not taken any steps to protect the interests of the Company and, in fact, have breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

154.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in improper practices.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Tesla has sustained significant damages.

156.    Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages, injunctive remedies, and other forms of equitable relief on Tesla's behalf.

157.    Plaintiff and the Company have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9)

158.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

159.     SEC Rule 14a-9 (17 C.F.R. § 240.14a-9, promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

160.     The Individual Defendants caused to be issued, and participated in the issuance of, materially misleading written statements to stockholders that were contained in the 2016, 2017 and 2018 proxy statements for Tesla's annual meetings and the 2018 proxy statement for a special meeting of stockholders held on March 21, 2018.   These proxy statements contained proposals to Tesla's stockholders urging them to re-elect the members of the Board, approve executive compensation and to vote against stockholder proposals for the Company.   The proxy statements, however, misstated or failed to disclose, among other things, (i) deficiencies in Tesla's internal and disclosure controls that were known to the Board when the proxy statements were filed; and (ii) reporting failures known to the Board when the proxy statements were filed.

161.     Additionally, the 2016, 2017 and 2018 proxy statements urged Tesla shareholders to reject proposals that would have promoted Board independence and accountability to Tesla's stockholders.   Specifically, in urging shareholders to reject a stockholder proposal regarding

proxy access, the 2018 proxy falsely states in the "Opposing Statement of the Board" that "the Company already has mechanisms to promote the accountability of the Board to its stockholders" and that the Nominating and Corporate Governance Committee which is entrusted with review of the composition of the Board and its committees and evaluation of individual Board members, "is comprised entirely of independent directors."  Similarly, in the 2017 proxy, the Board recommended that shareholders reject a proposal to declassify the Board.   The stockholder proposal cited in support, "the importance of greater accountability to shareholders," noted certain conflicts of interest that "plague Tesla's board" and described certain relationships with Musk that "call into question Gracias' ability to effectively lead the board in its monitoring responsibilities, including its oversight of [E.] Musk."  The 2017 proxy falsely states the current Board structure "allows our directors to maximize the interests of the Company and our stockholders over the long-term."  Likewise, the 2016, 2017 and 2018 proxy statements falsely state in support of re-electing the Individual Defendants to the Board that with the exception of E. Musk and K. Musk, all of its current members are independent directors and that Tesla's corporate governance policies and practices provide for oversight of Tesla's business and senior management by experienced, independent directors.

162.   The 2018 proxy statement for a special meeting of stockholders held on March 21, 2018 is likewise false and misleading.   In recommending that shareholders approve an astronomical and unprecedented CEO performance award to E. Musk, the Individual Defendants repeatedly characterize the process to design and recommend approval of the CEO performance award as one undertaken by "independent" directors.   Moreover, the proxy states that the Compensation Committee retained Compensia, Inc. ("Compensia") to "serve[] as its independent compensation consultant."   The proxy is materially misleading, however, in that it omits to

disclose the fee paid to Compensia, whether Compensia has provided any other services to Tesla and whether it conducted a conflicts of interest assessment by using the factors applicable to compensation consultants under the SEC rules.  A *Seeking Alpha* article dated April 15, 2016 observes that Tesla has utilized the services of Compensia since 2012, but fired Compensia in 2015, noting "We get no color on why, nor do we get a reassurance that the discontinuation of Compensia's services was not the result of a disagreement."  The proxy also omits to disclose that Compensia has previously served at the behest of E. Musk, Buss, and Gracias as a result of their positions with SolarCity.

163.    By reason of the conduct alleged in this Complaint, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Tesla misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heading Tesla's recommendation to re-elect the current Board, approve certain executive compensation, and the votes against stockholder proposals for the Company to adopt a policy to require an independent Chairman, to amend its bylaws to provide shareholder proxy access, and for declassification of the Board.

164.    The misleading information contained in the 2016, 2017 and 2018 proxy statements was material to Tesla's stockholders in determining whether or not to elect the Individual Defendants, approve certain executive compensation, votes against stockholder proposals for the Company to adopt a policy to require an independent Chairman, amend its bylaws to provide shareholder proxy access, and for declassification of the Board.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy-solicitation process in connection with the proxy statements was an

essential link in (i) the re-election of nominees to the Board, (ii) the approval of the executive compensation plan, and (iii) the votes against stockholder proposals for the Company to adopt a policy to require an independent Chairman, to amend its bylaws to provide shareholder proxy access, and for declassification of the Board.

165.    Plaintiff, on behalf of Tesla, hereby seeks relief for damages inflicted upon the Company based on the misleading 2016, 2017 and 2018 proxy statements in connection with the improper re-election of the members of the Board, approval of executive compensation, and the votes against stockholder proposals for the Company to adopt a policy to require an independent Chairman, to amend its bylaws to provide shareholder proxy access and for declassification of the Board.

166.    This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which the claim is based.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Authorizing the maintenance of this action as a derivative action, with Plaintiff as the derivative Lead Plaintiff;

B.    Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

C.    Awarding compensatory damages against defendants individually and severally in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

D.    Directing Tesla to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Tesla and its

shareholders from a repeat of the damaging events that occurred during the relevant time period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)     a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)    a provision  to permit shareholders of Tesla to nominate at least three candidates for election to the Board; and

(iii)   appropriately test and then strengthen the internal compliance and control functions; and

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

F.      Granting such other or further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 25, 2018

**RIGRODSKY & LONG, P.A.**

By:*/s/ Brian D. Long*

OF COUNSEL:

**HYNES KELLER & HERNANDEZ, LLC**
Beth A. Keller
118 North Bedford Road, Ste. 100
Mount Kisco, NY  10549
Telephone: (914) 752-3040
Facsimile: (914) 752-3041
Email: bkeller@hkh-lawfirm.com

**LAW OFFICE OF DEBRA S. GOODMAN P.C.**
Debra Goodman
1301 Skippack Pike
Suite 7A #133
Blue Bell, PA  19422
Telephone: (610) 277-6057
Facsimile: (484) 231-1922
Email: dg@dsgoodmanlaw.com

Seth D. Rigrodsky (#3147)
Brian D. Long (#3147)
Gina M. Serra (#5387)
300 Delaware Avenue, Ste. 1220
Wilmington, DE  19801
Telephone: (302) 295-5305
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com

*Attorneys for Plaintiff*